**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRCT OF NEW YORK**

TOWN OF HARRIETSTOWN,

                Plaintiff,

       -against-

WESTCHESTER FIRE INSURANCE COMPANY; ACE
PROPERTY AND CASUALTY INSURANCE
COMPANY; BRANDYWINE HOLDINGS
CORPORATION,

                Defendants.

Index No.:    8:24-cv-1184 (MAD/DJS)

**COMPLAINT**

***Jury Trial Demanded***

Plaintiff Town of Harrietstown ("Plaintiff" or "Town") by and through its attorneys, Rigano LLC, as and for its complaint against Westchester Fire Insurance Company ("Westchester"), ACE Property And Casualty Insurance Company ("ACE"), and Brandywine Holdings Corporation (collectively, "Brandywine" and together with Westchester and ACE, "Defendants") alleges as follows:

**Nature of the Action**

1.     Town seeks a declaratory judgment of its rights under the insurance policies issued by Defendants to Town discussed below as well as damages for Defendants' breach of contract and bad faith.

2.     Specifically, Town brings this action against Defendants for a declaration pursuant to 28 U.S.C. § 2201 and other applicable laws seeking a determination and declaration that Defendants have: (i) a duty to defend the Town with respect to the NYSDEC Claim (defined below), and (ii) have committed bad faith.  Town also seeks damages for Defendants' breach of contract and bad faith.  Town reserves its rights to seek a declaratory judgment against Defendants

1

regarding the duty to indemnify and assert all other claims and causes of action.

## Jurisdiction and Venue

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the ground that diversity exists between Town and each Defendant and the damages exceed the jurisdictional requirement.

4.      Venue properly lies in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because: (i) a substantial part of the events or omissions giving rise to the claim occurred within the Northern District of New York, including negotiation of the policies at issue and all acts associated with coverage in connection with the NYSDEC Claim (defined below), and (ii) the Airport (defined below), which is the subject of the NYSDEC Claim, is situated within the Northern District of New York

5.      Personal jurisdiction exists over each Defendant pursuant to New York Civil Practice Law and Rules §§ 301, 302, 1501, New York Business Corporation Law § 1314 and other applicable law.

6.      Each Defendant has conducted substantial/regular business in the State of New York.  At all relevant times, Defendants marketed, promoted, sold and/or administered insurance policies within the state of New York, including the Policies (as defined below).

## Parties

7.      Plaintiff Town of Harrietstown is a municipality located in Franklin County New York.  Lake Clear, New York is a hamlet within the Town.

8.      Town owns and operates the Adirondack Regional Airport (the "Airport"), which is located in the Hamlet of Lake Clear.  The Airport's mailing address is 96 Airport Road, Saranac Lake, New York 12983.  The Airport is a Part 139 public use Airport consisting of approximately

1,158 acres.

9.     Defendant Westchester Fire Insurance Company is a Pennsylvania insurer registered to do business in New York with a principal place of business of 436 Walnut Street Philadelphia, Pennsylvania.

10.     Defendant ACE Property And Casualty Insurance Company is a Pennsylvania insurer with a principal place of business of 436 Walnut Street Philadelphia, Pennsylvania.

11.     Defendant Brandywine Holdings Corporation is a Delaware corporation responsible for the management of existing policies and related claims of, *inter alia*, Defendant Westchester and Defendant ACE with a principal place of business at 510 Walnut Street Philadelphia, Pennsylvania.

12.     Defendant Brandywine has managed the Policies (defined below) and NYSDEC Claim on behalf of Defendant Westchester and Defendant ACE.

13.     Defendant Brandywine is the agent for Defendant Westchester and Defendant ACE with respect to the Policies and the NYSDEC Claim.

## **Factual Background**

### I.     **The Policies**

14.     Defendant Westchester issued the following Airport liability policies to the Town: (i) Westchester Fire Policy No. APN 670209 for the policy year 06/01/00-06/01/01, and (ii) Westchester Fire Policy No. APN 670521 for the policy year 06/01/01-06/01/02 (collectively, the "Westchester Policies").

15.     Defendant ACE issued the following Airport liability policies to the Town: (i) ACE Policy No. AAP N00035749 for the policy year 06/01/02-06/01/03, (ii) ACE Policy No. AAP N00052486 for the policy year 06/01/2003-06/01/2004, and (iii) ACE Policy No. N00977676 for

the policy years 06/01/2004-01/01/2021 (collectively, the "ACE Policies" and together with the Westchester Policies, the "Policies").

16.    Town is a named insured under the Policies.

17.    Each of the Policies provides general liability coverage for Town's operation of the Airport on an occurrence basis.

18.    The Policies contain provisions requiring Defendants to defend Town against any suits seeking damages for, *inter alia*, property damage or other covered liabilities.

19.    The limits of each Policy is $5 million per occurrence.

20.    Under each Policy, defense costs do not erode the limits.

21.    Each of the Policies contains a pollution exclusion.  That exclusion provides:

**SECTION II - COMMON COVERAGE EXCLUSIONS**
All Coverages included in this policy are subject to the following exclusions.

A. Noise and pollution and other perils.

1. This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:

. . .

(b) pollution and contamination of any kind whatsoever,

. . .
unless caused by or resulting in a crash fire explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

2. With respect to any provision in the policy concerning our duty to investigate or defend claims, such provision shall not apply and we shall not be required to defend:
(a) claims excluded by Paragraph 1; or
(b) a claim or claims covered by the policy when combined with any claims excluded by Paragraph 1 (referred to below as "Combined Claims").

4

> 3. In respect of any Combined Claims, we shall (subject to proof of loss and the LIMITS OF INSURANCE) reimburse you for that portion of the following items which may be allocated to the claims covered by the policy:
>
> (i) damages awarded against any insured; and
> (ii) defense fees and expenses incurred by any insured.
>
> . . .

22.    Further an endorsement to each of the Policies titled "AMENDMENT OF NOISE AND POLLUTION AND OTHER PERILS ENDORSEMENT" ("Pollution Endorsement") states:

> This endorsement modifies insurance provided under AIRPORT OWNERS AND OPERATORS GENERAL LIABILITY POLICY.
>
> Paragraph 1.(b) of Exclusion A. of Common Coverage Exclusions (Section II) does not apply to pollution or contamination of "your product."

23.    The Policies define "Your Product" as: "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by [] You . . ."

24.    "You" is defined as the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  Town of Harrietstown is a Named Insured on all policies.

25.    When the Pollution Endorsement is combined with the policy language, the pollution exclusion reads:

> This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of pollution and contamination of any kind whatsoever except for pollution and contamination of your product.

26.    As applicable to this action, the plain reading of this section is:

> This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of pollution and contamination of any kind whatsoever except for pollution and contamination of AFFF handled or disposed by Town at the Airport.

27. The pollution exclusion is inapplicable because the basis of the NYSDEC Claim is contamination caused by Town's disposal of AFFF at the Airport

28. The pollution exclusion is separately inapplicable because Town used AFFF in response to crashes and fires at the Airport in accordance with Federal Aviation Administration ("FAA") guidelines and requirements.

## II. The NYSDEC Claim

### a. PFAS Overview

29. Per- and polyfluoroalkyl substances ("PFAS"), are a family of hundreds of man-made chemicals that do not exist naturally comprised of primarily carbon and fluorine.

30. The following PFAS are currently subject to existing regulation and are at issue in this proceeding: Perfluorooctanoic acid ("PFOA"), Perfluorooctane sulfonate or Perfluorooctane Sulfonic Acid ("PFOS"), Perfluorohexane sulfonate or Perfluorohexane sulfonic acid ("PFHxS") and Perfluorononanoic acid ("PFNA").

31. PFAS are known as "forever chemicals" and can persist in the environment for decades, if not centuries.

32. PFOA, PFOS, PFHxS and PFNA readily move through soil, sand and water.

33. PFOA, PFOS, PFHxS and PFNA are highly soluble in water.

### b. Environmental Impacts of PFAS

34. PFOA, PFOS, PFHxS, PFNA and other PFAS contamination of environmental media (e.g. soil, groundwater, surface water, wildlife, and biota) is prevalent throughout the

country.

35.    Part 139 Airports are of particular concern for PFOA, PFOS, PFHxS, PFNA and other PFAS contamination due to FAA-directed use and storage of aqueous film-forming foam ("AFFF") at those facilities.

36.    Upon PFOA, PFOS, PFHxS, PFNA or other PFAS coming into contact with soil, they migrate downward through the soil until they reach the groundwater.

37.    PFOA, PFOS, PFHxS, PFNA and other PFAS readily dissolve into groundwater.

38.    With its natural movement, the groundwater flows and, if contaminated with PFAS, the groundwater carries PFAS spreading the contamination.

39.    Contaminated groundwater may flow into drinking water wells and surface water bodies thereby causing contamination of drinking water, surface water bodies, surface water sediment, and potentially wildlife and biota contained therein or surrounding.

### c.    **Applicable PFAS Regulations**

40.    In 2016, PFOA and PFOS were added to New York State's list of hazardous substances.

41.    In 2020, New York State adopted a binding maximum contaminant level ("MCL") of 10 ppt each for PFOA and PFOS.

42.    A MCL is the maximum level of a contaminant allowed in public drinking water, which, once established, creates a legally enforceable standard that requires public water systems to monitor, report findings and keep the contaminant below the level set.

43.    MCLs also serve as a remediation guideline for private drinking water wells.

44.    In New York, an MCL applies as a binding groundwater cleanup standard where groundwater is used as drinking water unless a more stringent groundwater cleanup standard

exists.

45.     In 2023, New York State Department of Environmental Conservation ("NYSDEC") adopted final ambient water quality guidance values that are more stringent than the MCLs, which serve as groundwater cleanup criteria where groundwater is used as drinking water, such as at the Airport.  Those standards are 6.7 ppt for PFOA and 2.7 ppt for PFOS.

46.     In 2024, the United States Environmental Protection Agency ("EPA") promulgated the following maximum contaminant levels (collectively, the "EPA MCLs"): (i) 4 ppt for PFOA, (ii) 4 ppt for PFOS, (iii) 10 ppt for PFHxS, and (iv) 10 ppt for PFNA.  In addition, EPA adopted a "hazard index" MCL for four combined chemicals: PFHxS, PFNA, hexafluoropropylene oxide dimer acid ("Gen-Ex") and Perfluorobutanesulfonic acid ("PFBS") , which requires analysis of a formula to determine if the "hazard index" MCL is exceeded.

47.     As the most stringent regulation applies, the applicable regulatory PFAS groundwater criteria at the Airport are: (i) PFOA 4 ppt, (ii) PFOS 2.7 ppt, (iii) PFHxS 10 ppt, (iv) PFNA 10 ppt, (v) PFBS 2,000 ppt (with PFHxS, PFNA and PFBS also being subject to EPA's hazard index).

48.     NYSDEC has adopted soil cleanup criteria for the protection of groundwater of 0.8 ppb and 1.0 ppb for PFOA and PFOS, respectively.

49.     In 2024, EPA designated PFOA and PFOS as hazardous substances under  Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

### d.  AFFF

50.     AFFF is a fire fighting foam typically used on petroleum-based fires.

51.     AFFF contained PFOA, PFOS, PFHxS, PFNA and PFBS, other PFAS, and/or their

precursors.

52. AFFF concentrate is mixed with water to make a liquid foam which is aerated and applied to fire suffocating the fire of oxygen and thereby extinguishing it.

53. Upon AFFF being sprayed in accordance with its intended use and instructions, the AFFF material contacts the ground and PFOA, PFOS, PFHxS, PFNA, other PFAS and/or their precursors enter the soil.

54. PFOA, PFOS, PFHxS, PFNA, their precursors and other PFAS then migrate through the soil to the groundwater below causing PFAS contamination.

55. Town had no concrete knowledge of the environmental issues associated with AFFF until NYSDEC designated the Airport as a superfund site as set forth below.

56. AFFF has been stored and used at, among other places, airports throughout the country, including the Airport.

57. As of 2006, the FAA required Part 139 airports, including the Airport to purchase AFFF that complies with military specifications.

58. Prior to 2006, FAA recommended Part 139 Airports use AFFF.

59. FAA directed airport operators, including the Town, to use AFFF in response to emergencies and to train.

60. In accordance with FAA guidelines and requirements, AFFF used and stored by the Town at the Airport contained PFOA, PFOS, PFHxS, PFNA and PFBS, other PFAS, and/or their precursors.

61. AFFF use caused contamination at the Airport, as well as the superfund designation, discussed below.

9

e. **Introduction of PFOA, PFOS, PFHxS, PFNA and PFBS to Environmental Media At the Airport**

62. According to Town's records, Town purchased Milspec AFFF produced by 3M Co. and Chemguard Inc.

63. AFFF produced by 3M and Chemguard are now known to have contained or degraded to PFOS, PFOA, PFHxS, PFNA and other PFAS.

64. Town always used AFFF in accordance with AFFF manufacturer directions and FAA guidance and direction.

65. Throughout the time AFFF containing PFOA, PFOS, PFHxS, PFNA and PFBS, and/or their precursors was used and stored at the Airport, Town received no warning of the environmental and health perils of AFFF.

66. The first known release of AFFF at the Airport was in October 1997 in response to a plane crash. No known use, disposal or release of AFFF occurred at the Airport prior to that crash.

67. Use and storage of AFFF has caused contamination of environmental media, including soil, groundwater, surface water, wildlife and biota, at and around the Airport.

68. PFOA, PFOS, PFHxS, PFNA and PFBS, has been detected in soil, groundwater and surface water at and around the Airport above regulatory thresholds.

69. As PFOA, PFOS, PFHxS, PFNA and PFBS are biopersistent, it is expected that the contaminated environmental media will remain contaminated for decades absent active remediation.

f. **NYSDEC's Detection of PFAS in Environmental Media at and around the Airport**

70. NYSDEC, through its contractor TRC Engineers, Inc., conducted subsurface and

10

surface water sampling at the Airport by a Site Characterization in August 2018.  The sampling results and findings of NYSDEC were released in a Site Characterization Report for the Airport in March 2019.

71.    The NYSDEC report reveals NYSDEC's determination that PFOA, PFOS, PFHxS, PFNA and PFBS are present in: (i) the groundwater at, and likely around, the Airport, and (ii) surface water bodies immediately adjacent to the Airport.

72.    In groundwater, NYSDEC detected PFOS and PFOA at levels up to 18,000 ppt and 91 ppt, respectively, or over 6,600 and 22 times groundwater cleanup standards.

73.    In surface water, NYSDEC detected PFOS and PFOA at levels up to 990 ppt and 9.3 ppt, respectively.

74.    Several other PFAS chemicals were detected in groundwater and surface water including, PFHxS, up to 8,300 ppt in groundwater, or 830 times regulatory criteria, and 250 ppt in surface water.

75.    Contaminated groundwater may have migrated offsite, impacting surface water bodies, wildlife and biota.

76.    NYSDEC concluded AFFF is the likely source of contamination at the Airport.

     **g.  NYSDEC Designates the Airport as a Superfund Site**

77.    In October 2020, NYSDEC issued a Public Notice designating the entirety of the 1,158 acre Airport as a Class 2 Inactive Hazardous Waste Site due to the detection of PFAS in groundwater and surface water via the Site Characterization.

78.    The Class 2 designation means that "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

11

79.     The superfund site designation requires the full nature and extent of the contamination both at the Airport and emanating therefrom to be investigated and remediated at a significant cost to the Town.

80.     On November 5, 2020, NYSDEC sent a letter to the Town of Harrietstown advising the Town of the superfund designation and stating, in pertinent part:

> The Department has determined that you, as the past or present owner, arranger, generator, transporter, supplier, or operator of the Site, including successors and assigns of these same entities, are potentially responsible for the Site's contamination.
>
> Be advised, responsible parties are liable for the reimbursement of funds expended by the State of New York (the "State") in taking response actions at sites where hazardous substances and/or wastes have been released, including investigative, planning, removal and remedial work.
>
> Accordingly, in furtherance of ECL and the SFL, the Department hereby requests that you implement or finance a remedial program in connection with the contamination at or emanating from the Site. The agreement to undertake or finance a remedial program at the Site must be memorialized in an administrative consent order (a "Consent Order") with the Department.
>
> If you do not enter into a Consent Order, the State may use funds from the Hazardous Waste Remedial Fund established pursuant to the SFL, and in accordance with the ECL and the rules and regulations promulgated thereto, to undertake the investigation and/or remediation of contamination at and/or emanating from the Site. The State's costs incurred relative to such Site contamination, as well as any past costs and interest, will be recoverable by the State from the responsible parties as provided by 42 USC§ 9607, the ECL, the SFL, and any other applicable provision of state and/or federal law.
>
> In the event you do not enter into a Consent Order within 120 days of the date of this letter, the Department may authorize a contractor to proceed with implementing work plans to perform the investigation and/or remediation of contamination at or emanating from the Site.
> . . .

12

> You or your attorney must contact the Department's Project Manager or Project Attorney by 12/7/2020 to discuss whether you intend to enter into a Consent Order to implement a remedial program for the Site, or whether you intend to remain liable for costs incurred by NYSDEC for the remedial program and selected remedy. If you do not contact the Department, you may not receive any further notice. The Department may start accruing costs, which are potentially your responsibility, and these costs may be referred to the Attorney General's office for collection.

81. As a result of the superfund site designation, NYSDEC demanded and required pursuant to the New York Environmental Conservation Law ("ECL") and applicable NYSDEC regulations, that the Town, *inter alia*: (i) pay or reimburse New York State's past and future costs associated with NYSDEC's site characterization (SC) and future costs associated with the investigation and remediation of the Airport and contamination emanating therefrom, and/or, (ii) conduct and pay for a Remedial Investigation (RI), Feasibility Study (FS) and remediation of the contamination at and emanating from the Airport under NYSDEC oversight.

82. Upon receiving the November 5, 2020 letter, Town, through its insurance broker Northern Insuring, submitted its claim (the "NYSDEC Claim") on Defendants.  On  November 12, 2020, the Town placed Defendants on notice of the single claim made by NYSDEC stating: "Claimant alleges insured['s site] has been identified as a superfund site. Firefighting foam that has been used by insured for training purposes, has been identified as hazardous waste and a significant threat to public health and/or the environment. Insured is responsible for expense of remediation."

83. On November 18, 2020, Brandywine acknowledged receipt of the Claim on behalf of Defendant ACE.  By that letter, Brandywine, among other things: (i) identified the NYSDEC Claim as a single claim, (ii) assigned the NYSDEC Claim with a single claim number "MCS

#19811", (iii) acknowledged that Town only submitted one claim, and (iv) and requested further documentation.

84.     On June 25, 2021, Brandywine, on behalf of ACE, sent a letter to Town setting forth ACE's agreement to defend the Town subject to a reservation of rights pursuant to the Policies.

85.     Brandywine's June 25, 2021 letter provided ACE's coverage position with respect to Policies 52486 and 977676.

### h.  **The Consent Order**

86.     On May 7, 2021, NYSDEC sent a draft Order on Consent and Administrative Settlement (the "Consent Order") and requested Town sign it or provide comments.  That draft Consent Order imposed, *inter alia*, obligations on the Town as set forth in above paragraph 81.

87.     Notably, NYSDEC's first draft of the Consent Order stated NYSDEC's conclusion that:  "[c]ontamination at the Site appears to be the result of aqueous film-forming foam (AFFF) spilled or used for training, responding to plane crashes, and/or for other purposes at the Site."

88.     That same language is contained in the fully executed Consent Order.

89.     On May 7, 2021, Town sent the proposed Consent Order to Brandywine for comment and approval.

90.     Brandywine did not object to, and authorized, Town to sign the Consent Order after reviewing the Consent Order and providing comments to the same.

91.     On August 23, 2021, NYSDEC sent an email stating:

> The Department demands that the Town of Harrietstown enter into the proposed Consent Order for the Adirondack Regional Airport site ("Site").

14

As the owner of the Site, the Town is a responsible party for the Site's contamination under 6 NYCRR 375-2.2(i). Pursuant to ECL 27-1313(3), the Department has the authority to order the Town to develop and implement an inactive hazardous waste disposal site remedial program at the Site, and is exercising that authority. As you know, the remedial program is subject to the Department's approval.

92.    On August 26, 2021, the Town Board passed a resolution authorizing the Town Supervisor to sign the Consent Order. On August 27, 2021, Town notified Brandywine of the same.

93.    On August 27, 2021, Town with Brandywine's authority, executed the Consent Order and sent the same to NYSDEC.

94.    On September 27, 2021, NYSDEC executed the Consent Order.

95.    Town expects compliance with the Consent Order to cost millions of dollars.

96.    By agreeing to defend Town with respect to the NYSDEC Claim, Brandywine agreed to defend the Town's obligations under the Consent Order, including, but not limited to the Remedial Investigation and other related work or payments NYSDEC requires.

97.    Thereafter, with knowledge, comments, and authorization of Brandywine, CT Male was retained to serve as environmental consultant for the Town. The retention was authorized by Brandywine after CT Male's qualifications and other consultants' qualifications were considered.

98.    CT Male provided a budget to Brandywine for each task (e.g., Citizen Participation Plan, Remedial Investigation Workplan, Remedial Investigation work, etc.) and commenced work only after receiving Brandywine's approval for each such task.

15

99.     Thereafter, with knowledge, comments, and authorization of Brandywine, Town, through CT Male, submitted a Records Research Report, Public Participation Plan and Remedial Investigation Workplan to NYSDEC in accordance with the terms of the Consent Order.

### i.     The Remedial Investigation

100.    CT Male prepared a Remedial Investigation Workplan ("RIWP").  The RIWP outlined the process by which sampling will occur and the location of the samples to define the nature and extent of contamination at the Airport.  After obtaining, Brandywine's comments and approval, CT Male submitted the draft RIWP to NYSDEC.

101.    After NYSDEC provided its comments to the RIWP, Town, with Brandywine's knowledge, comments, and approval submitted a revised RIWP to NYSDEC.

102.    On July 18, 2022, NYSDEC approved the RIWP.

103.    The RIWP, with Brandywine's knowledge and approval, identified, *inter alia*, AFFF use locations including various plane crash locations and locations where training with actual fire occurred throughout the Airport.

104.    The RIWP required sampling of soil, groundwater and other environmental media in those areas due to AFFF use.

105.    Thereafter, Town, through, CT Male and with approval of Brandywine conducted sampling at the Site.  By the sampling, CT Male investigated potential areas of concern.

106.    CT Male completed the first phase of the RIWP, which involved soil sampling.

107.    CT Male prepared a Technical Memorandum to be submitted to NYSDEC detailing the findings of the first phase of the RI and outlining the next phase of the remedial investigation.  That Technical Memorandum was submitted to NYSDEC only after Brandywine provided its comments and approval.

16

108. By that Technical Memorandum, CT Male, with Brandywine's comments and approval, concluded that PFAS presents the only contaminants of concern and such contamination is the result of AFFF in response to crashes and live fires extinguished for fire training.

109. The Technical Memorandum reported various locations where PFOS (an AFFF constituent) in shallow soil contamination was detected in excess of NYSDEC's applicable groundwater protection soil criteria of 1 ppb.

110. One such location is the location where a 1997 United Arab Emirates (UAE) military giant C-130 cargo transport airplane was staged pending an international investigation after an inflight emergency occurred where the plane's propeller dislodged and traversed through the fuselage after the engine failed causing the plane to crash at the Airport.

111. This location appears to be upgradient of where NYSDEC's consultant detected PFOS in groundwater at 18,000 ppb.

112. Thereafter, CT Male detected PFOS in shallow soil above regulatory criteria where that aircraft crashed.

113. The chemical signature in soil and in groundwater detected at the Airport is consistent with AFFF.

114. All detected contamination at the Airport is from AFFF.

115. Upon receiving NYSDEC's authorization to proceed with the next phase of the investigation, which includes the first phase of groundwater sampling, CT Male sought approval from the FAA to conduct such sampling as such samples required drilling on Airport property and within the proximity of active aircraft runways.

116. That approval took many months to obtain.

17

117. Upon obtaining that approval, CT Male scheduled drilling to occur at the end of August 2024.

118. On June 28, 2024, CT Male, through undersigned counsel, submitted a budget for approximately $1 million to Brandywine for the next phase of the NYSDEC-required work. Town requested that Brandywine approve the budget.

119. As set forth below, Brandywine never provided comments or approval of the budget.

120. Instead, on the eve of CT Male's scheduled work, Brandywine sent its bad faith disclaimer based on nothing but its newfound reading of the Policies.

### III. Three Years After Agreeing to Defend, Defendants Disclaim On Their Defense Obligations In Bad Faith Based Solely On Their Newfound Reading of the Policy and No New Facts, Immediately Prior to Town Sampling Causing Delay

121. For three years Town worked closely with Brandywine giving Brandywine the opportunity to comment on any and all submissions to NYSDEC and the public during the entirety of that time period.

122. Town did not proceed with any submission or work before obtaining specific authorization from Brandywine.

123. As discussed above, on June 28, 2024, CT Male, through undersigned counsel, submitted a budget to Brandywine to perform the work required by NYSDEC. Town requested that Brandywine approve the budget, which exceeded $1 million

124. Pending Brandywine approval, CT Male scheduled the NYSDEC-required field work and other services to proceed in August 2024 to expedite the sampling.

125. Brandywine failed to respond or otherwise approve the budget.

126. Instead, on July 23, 2024, after CT Male scheduled the NYSDEC-required field work (with Brandywine's knowledge), Brandywine submitted a "supplemental reservation of rights" letter, more than three (3) years after Defendants issued their June 25, 2021 letter agreeing to defend.

127. By that new letter, Defendants disclaimed on their responsibility to defend asserting that based on their newfound unilateral reading of the Policies and without identifying any new facts in support of their new position (of which there after none), they have no duty to defend Town because the NYSDEC Claim is a "Combined Claim".

128. Defendants disclaimed on the eve of Town conducting ~$1 million of investigation work required by NYSDEC, for which Town understood Defendants would cover based on Defendants June 15, 2021 letter, Defendants' defense of Town for three years, and applicable law.

129. Due to Defendants' actions, Town, which has a small budget and cannot afford to conduct the Remedial Investigation, has been forced to advise NYSDEC that it must suspend the Remedial Investigation and has directed to CT Male to cancel the scheduled work due to lack of available funding.  Town is concerned that this delay may cause contamination to spread, increasing Town's ultimate cost of the investigation and remediation.

130. Defendants' disclaimer is wrong.

131. Defendants have a duty to defend the Town for the NYSDEC Claim.

    a. **Defendants' New Flip-Flopped Position Based on No New Information After Defending The Town for Three Years Is Incorrect**

132. Defendants' new flip-flopped position based on no new information after defending the Town for three years is incorrect for several reasons.

19

133.    Defendants' position is solely based on their newfound reading of the Policies, not any new facts, and is contrary to the Policies' plain language and Defendants' own June 25, 2021 letter.

134.    Defendants incorrectly now assert for the first time that the "Combined Claims" provision within the pollution exclusion divests their obligation to defend.

135.    Defendants are wrong.

> **i. The Pollution Exclusion, Which Includes the "Combined Claims" Provision, Is Entirely Inapplicable Due To The "Your Product" Exception**

136.    The pollution exclusion is entirely inapplicable due to the "your product" exception.

137.    Applicable to the facts of this claim, when the Pollution Endorsement is combined with the policy language, the pollution exclusion reads:

> This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of pollution and contamination of any kind whatsoever except for pollution and contamination of your product.

138.    When the double negative is removed, the plain language of the Policy, as applicable to the NYSDEC Claim, means:

> This policy covers claims directly or indirectly occasioned by, happening through or in consequence of pollution and contamination of AFFF handled or disposed by Town at the Airport.

139.    This, of course, makes sense as FAA provided guidance and obligations to Town to purchase, store and use AFFF at the Airport.  Town, as insured, would expect any pollution or contamination caused by such AFFF handling/disposal in accordance with FAA direction to be covered by the Policies, which provide Town with airport liability insurance.

20

140. Defendants knew, or should have known, of the FAA direction as they are sophisticated insurers having issued airport liability policies for billions of dollars in limits to airports throughout the country for decades.

141. To Town's knowledge, based on the records review and sampling data to date, all contamination caused by AFFF at the site was the result of AFFF handled and disposed by Airport personnel, who are Town employees, at the Airport.

142. The pollution exclusion is inapplicable to the entirety of the NYSDEC Claim as NYSDEC designated the Airport as a Superfund Site because "[c]ontamination at the Site appears to be the result of aqueous film-forming foam (AFFF) spilled or used for training, responding to plane crashes, and/or for other purposes at the Site" and all contamination detected to date is the result of Town's use of AFFF.

143. Brandywine's June 25, 2021 letter and subsequent correspondence did not reference or otherwise address the Pollution Endorsement. Accordingly, Defendants waived all rights to disclaim or limit coverage associated therewith, or otherwise issuing an interpretation of the Pollution Endorsement different than Town's plain meaning interpretation.

### ii. There Is No "Combined Claim" as the NYSDEC Claim Is The Only Claim

144. There is no "Combined Claim".

145. The plain language of the Policies defines "Combined Claim" as: "*a claim or claims* covered by the policy when combined *with any claims* excluded by [the pollution exclusion]".

146. The Policies' plain language requires at least two claims to exist to possibly constitute a "Combined Claim".

21

147. Here, there is one claim: the NYSDEC Claim.

148. Defendants ignore this plain language professing with no support that each sample required by NYSDEC constitutes a separate claim. Defendants' sole stated explanation was that some samples required by NYSDEC are covered by the pollution exclusion while others are not.

149. But each sample is not a separate claim. Defendants' own June 25, 2021 letter references the NYSDEC Claim as one claim, and Defendants did not submit a coverage position for each separate sample or separate area of concern.

150. Defendants failed to identify any legitimate basis for how the NYSDEC Claim alone, which is the only claim at issue, could possibly constitute a "Combined Claim".

151. Defendants' bad faith is evidenced by, *inter alia*: (i) the plain language of the Policies, (ii) Defendants' defense of the Town for three years based on that plain language, (iii) Defendants' flip-flopped position being issued on the eve of the next round of sampling budgeted at ~$1 million, and (iv) Defendants' flip-flopped position being based solely on a newfound strained reading of the Policies, not new facts or law, that is contrary to Brandywine's June 25, 2021 letter.

### iii. Defendants' Waived Their Right To Rely on the "Combined Claims" Provision

152. Within their June 25, 2021 reservation of rights letter, Brandywine failed to assert, and otherwise failed to reserve Defendants' rights to assert, that the NYSDEC Claim was a "Combined Claim".

153. Defendants waived their right to now assert for the first time, three years later that the "Combined Claims" provision applies.

22

154.    In the June 25, 2021 letter, Brandywine repeatedly acknowledged that there is only one claim as Brandywine stated "[a]s you know, we acknowledged the above-referenced claim by letter dated November 18, 2020" and throughout that letter repeatedly used the word "claim" in singular form.

155.    At no point in Brandywine's June 25, 2021 letter did Defendants reserve their rights to assert that the sole claim was a "combined claim".  By failing to raise this in the June 25, 2021 letter, Defendants waived their right to disclaim, or otherwise alter their coverage decision, on this basis.

156.    At no point in Brandywine's June 25, 2021 letter did Defendants reserve their rights to covert their defense obligation into a reimbursement obligation.  By failing to raise this in the June 25, 2021 letter, Defendants waived their right to disclaim, or otherwise alter their coverage decision, on that basis.

157.    At no point in Brandywine's June 25, 2021 letter did Defendants identify any other claim asserted by the Town that would be administered with the Claim.  By failing to raise this in the June 25, 2021 letter, Defendants waived their right to disclaim, or otherwise alter their coverage decision, on that basis.

### iv.    Even If the Pollution Exclusion Is Applicable, Defendants Still Have a Duty to Defend Due to the "Crash/Fire/Explosion" Exception To The Pollution Exclusion

158.    The pollution exclusion does not apply if contamination was "caused by or resulting in a crash fire explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation".

159.    NYSDEC's consent order provides: "[c]ontamination at the Site appears to be the result of aqueous film-forming foam (AFFF) spilled or used for training, responding to plane crashes, and/or for other purposes at the Site."

160.    As set forth in the RIWP, which Defendants reviewed, commented on, and approved, several crashes that occurred throughout the Airport and associated locations are identified.

161.    In several of those crash and associated locations, PFAS contamination above regulatory criteria has been detected in shallow soil and in downgradient groundwater.

162.    As Town made Defendants aware, Town extinguished live fire with AFFF for fire training in accordance with FAA requirements and guidance.

163.    The vast majority of contamination detected to date was caused by AFFF use in response to crashes and fires.

164.    Accordingly, even if the pollution exclusion is applicable (it is not), Defendants still have a duty to defend Town due to the "crash/fire/explosion" exception to the pollution exclusion.

### v. Defendants Failed to Issue a Coverage Position With Respect to ACE Policy 35749 and Westchester Policies 670209 and 670521

165.    Town did not receive from Brandywine or otherwise any coverage position for ACE Policy 35749.

166.    Town did not receive from Brandywine or otherwise any coverage position for Westchester Policy 670209 or Westchester Policy 670521.

167.    Accordingly, Defendants waived all rights to disclaim, or otherwise limit coverage on ACE Policy 35749, Westchester Policy 670209 and Westchester Policy 670521.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### DECLARATORY JUDGMENT: DUTY TO DEFEND

168. Town realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

169. Defendants are contractually obligated under the Policies to defend Town with respect to the NYSDEC Claim because there is a reasonable possibility of coverage.

170. Defendants' refusal to provide a defense to Town constitutes a breach of their duty to defend under the Policies.

171. An actual and justiciable controversy exists between Town and Defendants concerning Defendants' duty to defend Town with respect to the NYSDEC Claim.

172. Town is entitled to a judicial declaration that Defendants are obligated to provide a defense to Town with respect to the NYSDEC Claim pursuant to the terms of the Policies.

### SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### BREACH OF CONTRACT

173. Town realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

174. Defendants entered into a valid and binding insurance contract with Town under the terms of the Policies.

175. Town has performed all of its obligations under the Policies, including timely payment of premiums, timely notice of the NYSDEC Claim and cooperation with Defendants.

176. Defendants breached the insurance contract by, *inter alia*:

   a. Unreasonably refusing to defend Town despite the potential for coverage under the Policies;

25

b. Misrepresenting the terms of the Policies to justify the denial of coverage;

c. Failing to provide a reasonable explanation of the denial of coverage;

d. Placing their financial interests above those of Town, in violation of its duty of good faith and fair dealing;

e. Forcing Town to bear the costs of investigation, remediation and other costs under the terms of the Consent Order with respect to the NYSDEC Claim.

177. As a result of Defendants' breach of contract, Town has suffered and continues to suffer substantial damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### BAD FAITH

178. Town realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

179. Under applicable law, Defendants owe Town a duty of good faith and fair dealing in handling insurance claims, including the NYSDEC Claim.

180. Defendants breached their duty of good faith and fair dealing and engaged in bad faith with respect to their handling of the NYSDEC Claim by:

a. Unreasonably refusing to defend Town despite the potential for coverage under the Policies;

b. Misrepresenting the terms of the Policies to justify the denial of coverage;

c. Failing to provide a reasonable explanation of the denial of coverage;

d. Placing their financial interests above those of Town, in violation of its duty of good faith and fair dealing;

26

e.   Forcing Town to bear the costs of investigation, remediation and other costs under the terms of the Consent Order with respect to the NYSDEC Claim;

f.   Disclaiming without warning and with no reasonable basis on the eve of sampling and drilling events causing delay;

g.   Engaging in other acts of bad faith in the handling of the NYSDEC Claim.

181.   As a direct and proximate result of Defendants' bad faith conduct, Town has suffered damages, including but not limited to, defense costs, liability, attorney's fees, and other expenses in an amount to be proven at trial.

**WHEREFORE,** plaintiff Town of Harrietstown requests judgment in its favor and against Defendants as follows:

i.   A declaratory judgment that Defendants have a duty to defend Town with respect to the NYSDEC Claim pursuant to the terms of the Policies;

ii.   A declaratory judgment that Defendants have committed bad faith with respect to their handling of the NYSDEC Claim;

iii.   An award of actual, direct, indirect, compensatory, incidental, consequential and punitive damages, including attorneys' fees and costs, incurred by Town as a result of Defendants' breach of its duty to defend and bad faith in an amount to be proven at trial but in no event being less than $10 million;

iv.   Prejudgment and post-judgment interest as allowed by law; and

v.   Any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Town hereby demands trial by jury as to all issues.

Dated:  September 27, 2024
        Melville, New York

                            Respectfully submitted,


                            **RIGANO LLC**
                            *Attorneys for Town of Harrietstown, New York*

                            By: */s/ Nicholas C. Rigano*
                                James P. Rigano, Esq.
                                Nicholas C. Rigano, Esq.
                                538 Broad Hollow Road, Suite 301
                                Melville, New York 11747
                                (631) 756-5900
                                nrigano@riganollc.com

28